# Court of Chancery.

## NEW-YORK, AUGUST, 1819.

### *In the Matter of Daniel Washburn.*

It is the law and usage of nations to deliver up offenders charged with felony and other high crimes, and who have fled from the country in which the crimes were committed, into a foreign and friendly jurisdiction.

And it is the duty of the civil magistrate to commit such fugitive from justice, to the end, that a reasonable time may be afforded for the government here to deliver him up, or for the foreign government to make application to the proper authorities here for his surrender. But if no such application is made in a reasonable time, the prisoner will be entitled to his discharge.

The evidence to detain such fugitive from justice, for the purpose of surrendering him to his government, must be such as would be sufficient to commit the party for trial, if the crime had been perpetrated here.

The 27th article of the treaty of 1795, between the United States and Great Britain, was merely declaratory of the law of nations on this subject; and since the expiration of that treaty, the principles of the general law of nations remain obligatory on the two nations.

Therefore, the chancellor, or a judge, in vacation, has jurisdiction to examine a prisoner before him on *habeas corpus*, and who has been taken in custody on a charge of *theft*, or felony, committed in Canada, or a foreign state, from which he has fled; and if sufficient evidence appears against him to remand him, or if there is not sufficient proof to justify his detention, to discharge him.

D. WASHBURN was brought before the Chancellor upon *habeas corpus*, allowed and directed to the sheriff of Rensselaer county. It appeared by the return, that he was detained in custody by virtue of a *mittimus* from the Recorder of Troy, under a charge of having in his possession 170 bills of the bank of Montreal, of the denomination of five dollars each, which had been feloniously taken from some person unknown, and that he had received and secreted the bills, knowing them to be so stolen.

The Chancellor, in pursuance of the act, entitled,

NEW-YORK,
1819.

Matter of
Washburn.

" an act to amend the act, entitled, an act to prevent unjust imprisonment, by securing the benefit of the writ of *habeas corpns*," (sess. 41. c. 277., which provides, " that in all cases of imprisonment, whether upon commitment of any criminal, or supposed criminal matter, or not, the Chancellor, Judge, or other officer, before whom any person may be brought on *habeas corpus*, in vacation time, shall, and may examine into the facts contained in such return, and into the cause of such imprisonment, and thereupon either discharge, or bail, or remand the party so brought, as the case shall require, and as to justice shall appertain,") proceeded to the examination of the prisoner, and of several witnesses, who were produced for and against him.

It appeared, that a theft had been committed at Kingston, in Upper Canada, on or about the 29th of June last, and that one George Ridout, upon whom the theft was committed, had 4,000 dollars, or upwards, stolen from him, at a public house in that town. That the prisoner was an inhabitant of Kingston, an acquaintance of G. R., and spent the night, or a part of the night, in which the money was stolen, in company with him. That the money stolen consisted of Montreal bills, and were said to be five dollar bills. That the prisoner left Kingston within the two last weeks on a journey to the United States. That he was in company with one Lyman Parks, who, on Tuesday last, at a bank in Troy, offered 900 dollars of Montreal bank bills, of five dollars each, to be exchanged, at four per cent. discount, and that the bills received in exchange were immediately handed by P. to the prisoner. The circumstances attending the intercourse between the

prisoner and Parks, and a denial by the prisoner, that
he had ever seen or known Parks before that time,
though it was proved that they had been together pre-
viously at Albany, and that they came down from the
Black river in company with each other, were the chief
grounds of the charge and commitment.

NEW-YORK,
1819.

Matter of
Washburn.

Cushman, and Van Vechten, for the prisoner, moved
for his discharge :

1. Because the Chancellor had no jurisdiction of the
case, even admitting the prisoner had stolen the bills in
question at Kingston, in Upper Canada, inasmuch as
our courts have no concern with crimes committed out
of the United States, and have no authority to arrest or
detain the offender.

2. Because the proof is insufficient to charge the pri-
soner with the theft, even if it had been committed
within this state.

M'Manus and Paine, in behalf of the prosecution,
referred to Str. 848. 4 Taunt. 34. and 1 Chitty on Cri-
minal Law, 16—46, in support of the jurisdiction.

THE CHANCELLOR. It is the law and usage of na-
tions, resting on the plainest principles of justice and
public utility, to deliver up offenders charged with felo-
ny and other high crimes, and fleeing from the coun-
try in which the crime was committed, into a foreign
and friendly jurisdiction. When a case of that kind
occurs, it becomes the duty of the civil magistrate, on
due proof of the fact, to commit the fugitive, to the
end that a reasonable time may be afforded for the go-
vernment here to deliver him up, or for the foreign go-
vernment to make the requisite application to the pro-
per authorities here, for his surrender. Who are the
*proper authorities* in this case ; whether it be the execu-

tive of the state, or, as the rule is international, the executive authority of the United States, the only regular organ of communication with foreign powers, it is not now the occasion to discuss. It is sufficient to observe, that if no such application be made, and duly recognized, within a reasonable time, the prisoner will then be entitled to his discharge upon *habeas corpus.* If the judicial authority has afforded sufficient means and opportunity for the exercise of this act of communitative justice, it has done its duty. Whether such offender be a subject of the foreign government, or a citizen of this country, would make no difference in the application of the principle ; though, if the prisoner, as in this case, be a subject of the foreign country, the interference might meet with less repugnance.

This doctrine is supported equally by reason and authority.

Vattel observes (b. 2. ch. 6. s. 76.) that to deliver up *one's own subjects* to the offended state, there to receive justice, is pretty generally observed with respect to great crimes, or such as are equally contrary to the laws and the safety of all nations. Assassins, incendiaries and robbers, he says, are seized every where, at the desire of the sovereign in the place where the crime was committed, and delivered up to his justice. The sovereign who refuses to deliver up the guilty, renders himself, in some measure, an accomplice in the injury, and becomes responsible for it. Professor Martens, also, in his Summary of the Law of Nations. p. 107., says, that according to modern custom, a criminal is frequently sent back to the place where the crime was committed, on the request of a power who offers to

do the like service, and that we often see instances of
this.

Grotius, who is of still higher authority, declares, (b. 2. ch. 21. s. 3, 4, 5.) that the state is accountable for the crimes of its subjects, committed abroad, if it affords them protection; and, therefore, the state where the offender resides, or has fled to, ought, upon application and examination of the case, either punish him according to his demerit, or deliver him up to the foreign state. He says, farther, that his doctrine applies equally to the subjects of the government in which the offender is found, and to fugitives from the foreign state. This learned jurist finally concludes, that this right of demanding fugitives from justice has, in modern times, in most parts of Europe, been confined, in practice, to crimes that concern the public safety, or which were of great atrocity, and that lesser offences were rather connived at, unless some special provision, as to them, existed by treaty.

Heineccius, in his commentary on these passages, (Prœlec. in Grot. h. t.) admits that the surrender of a citizen who commits a crime in a foreign country, is according to the law of nations; and he says farther, that it is to be deduced from the principles of natural law. We ought either to punish the offender ourselves, or deliver him up to the foreign government for punishment. So Burlemaqui, (part 4. c. 3. s. 23 to 19.) follows the opinion of Grotius, and maintains that the duty of delivering up fugitives from justice is of common and indispensable obligation.

It has been frequently declared, that the law of nations was part of the common law of England. (3 Burr. 1481. 4 Burr. 2016.) And if we recur to the English

NEW-YORK,   decisions, which may be considered as declaratory of
   1819.
            public law on the point, we shall perceive a full recog-
Matter of   nition of this general doctrine.
Washburn.
                In Rex v. Hutchinson, Trin. 29. Car. 2. (3 Keb. 785.)
            it appeared to the K. B. on *habeas corpus*, that the de-
            fendant was committed on suspicion of murder, in Por-
            tugal, and the court refused to bail him.    And again, in
            the case of colonel Lundy, (2 Vent. 314.) it was agreed,
            on a consultation of all the judges, that there was no-
            thing in the *habeas corpus* act to prevent a person guilty
            of a capital offence in Ireland, (then a distinct kingdom,
            though under the same king,) to be sent there to be tried.
            In the case of Rex v. Kimberly, (Str. 848.   Barnard·
            K. B. vol. i. 225. Fitzgib. 111. S. C.) the same point
            underwent a farther discussion.    The defendant being
            committed by a magistrate for a felony done in Ireland,
            " to be detained till there should be proper means found
            out to convey him to Ireland, to be tried," was brought
            into the K. B. by *habeas corpus*. Strange, for the
            prisoner, moved for his discharges, or for bail, insisting
            that justices of the peace had no power over crimes in
            Ireland, and that the *proviso* in the *habeas corpus* act
            gave no power as to offences in Ireland, which was a
            distinct kingdom, and that it was against the *habeas cor-
            pus* act to remove the prisoner to Ireland. But the court
            referred to the above cases, and remanded the prisoner ;
            observing that the form of the commitment was proper,
            and that if the prisoner was not removed to Ireland in
            a reasonable time, application might be again made to
            the court for his discharge.    To the same effect are the
            observations of the Court of Exchequer, in East India
            Company v. Campbell, (1 Ves. 246.) in which it was
            said, that " a person may be sent abroad by government

and tried, though not punishable in England ; like a case of one who was concerned in a rape in Ireland, and sent over there by the government, to be tried, though the K. B. refused to do it. Government may send persons to answer for a crime wherever committed, that he may not involve his country, and to prevent reprisals."

In support of the same doctrine and practice, we may refer to the uncontradicted remark of Heath, J. in the late case of Mure v. Kaye, (4 Taunt. 34.) and which Mr. Chitty, in the book cited by the counsel, seems to regard as law. " It has generally been understood," he observes, " that wheresoever a crime has been committed, the criminal is punishable according to the *lex loci* of the country, against the law of which the crime was committed ; and by the comity of nations, the country in which the criminal has been found, has aided the police of the county against which the crime was committed, in bringing the criminal to punishment. In Lord Loughborough's time, the crew of a Dutch ship mastered the vessel and ran away with her, and brought her into Deal, and it was held, we might seize them and send them to Holland. And the same has always been the law of all civilized countries.

Though these observations come in the shape of a *dictum* of a single judge, yet it ought to be understood, that Heath was a judge of very great experience, having sat upon the bench of the C. P., for the long period of forty years, and he was right, says Ch. J. Gibbs, in most cases that ever came before him.

Lord Coke says, (3 Inst. 180.) that " it is holden, and so it hath been resolved, that divided kingdoms under several kings, in league, one with another, are sanctuaries for servants or subjects, flying for safety from one

kingdom to another, and upon demand made by them, are not, by the laws and liberties of kingdoms, to be delivered." If, by *the laws and liberties of kingdoms*, he means the laws and usages of nations, the remark is founded in fact, and contradicted by history, and by the great work of Grotius, which was published in the lifetime of Lord Coke. With respect to the force and justness of this passage, we may refer to Wynne's Treatise on the Law and Constitution of England. (Eunomus, Dialog. 3. s. 67.) He asks, how has Lord Coke supported his doctrine ? He says, " it is holden, and so it has been resolved ;" but he neither tells us when, nor where, it was resolved. Wynne goes on to observe, that the assertion seems directly against the law of nations, and that, " if from the very nature of society, subjects are answerable to their own nation for their criminal conduct, *by the law of nations, they may be justly demanded of foreign states to which they fly*, and the refusal of delivering them up is a just cause of war." He observes, farther, that to prevent protection of fugitives by clauses in a treaty, only operates as a recognition, not a creation of right.

The 27th article of the treaty of 1795, between the United States and Great Britain, provided for the delivery of criminals charged with murder or forgery ; but that article was only *declaratory of the law of nations*, as were also a number of other articles in the same treaty. This was the case, for instance, with the provision in the 21st article, that it should not be lawful for foreign privateers, who have commissions from a prince or state in enmity with either nation, to arm their ships in the ports of either ; and, also, with the provision in the 25th article, that neither party should permit the ships or goods

of the other to be taken by foreign force, within the bays, ports or rivers of their territories. These articles, to use the language of *Wynne*, were the recognition, not the creation of right, and are equally obligatory upon the two nations, under the sanction of public law, since the expiration of that treaty, as they were before.

NEW-YORK, 1819.

Matter of Washburn.

There is nothing in the *habeas corpus* act which controls the application of this general law. The only provision in it which has any possible relation to the case, is that which declares, " that no citizen of this state, being an inhabitant or resident within it, shall be sent prisoner to any place whatsoever out of this state, for any crime or offence committed within this state." The prohibition is thus expressly confined to crimes committed within this state.

It has been suggested, that theft is not a felony of such an atrocious and mischievous nature, as to fall within the usage of nations on this point. But the crimes which belong to this cognizance of the law of nations, are not specially defined ; and those which strike deeply at the rights of property, and are inconsistent with the safety and harmony of commercial intercourse, come within the mischief to be prevented, and within the necessity as well as the equity of the remedy. If larceny may be committed, and the fugitive protected, why not compound larceny, as burglary and robbery, and why not forgery and arson ? They are all equally invasions of the rights of property, and incompatible with the ends of civil society. Considering the great and constant intercourse between this state and the provinces of Canada, and the entire facility of passing from one dominion to the other, it would be impossible for the inhabitants on the respective frontiers to live in security, or to main-

tain a friendly intercourse with each other, if thieves could escape with impunity, merely by crossing the territorial line. The policy of the nation, and the good sense of individuals, would equally condemn such a dangerous doctrine. During the existence of the treaty of 1795, it might well have been doubted, whether the two governments had not, by that convention, restricted the application of the rule to the two specified cases of murder and forgery, for it is a maxim of interpretation, that *enumeratio unius est exclusio alterius.* But if it were so, yet upon the expiration of that treaty, the general and more extensive rule of the law of nations revived.

2. The difficulty, then, in this case, is not as to a want of jurisdiction, but the proof is insufficient to detain the prisoner. There is no evidence that the bills offered in exchange at the bank in Troy were the same bills that were stolen at Kingston ; and however suspicious the conduct of the prisoner and his associate may be, and however untrue his allegations as to Parks, yet, as we have no proof that the prisoner committed the theft, or that he or his associate were in possession of the stolen goods, he must, on that ground, and on that ground alone, be discharged.

The evidence to detain the party, for the purpose of surrender, must be sufficient to commit the party for trial, if the offence was committed here. The admonition in Grotius is not to be forgotten—*non decet homines dedere causa non cognita.*

Prisoner discharged.