SHEAT v. HALLETT. See Case No. 10,469.

## Case No. 12,734.

### In re SHEAZLE et al.

[1 Woodb. & M. 66.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1845.

EXTRADITION—TREATY WITH GREAT BRITAIN—APPLICATION FOR SURRENDER—EXAMINATION—SURRENDER.

1. Under the treaty with Great Britain of August, 1842, prisoners, charged with piracy, committed contrary to acts of parliament, and on board a British vessel, may be arrested here, and surrendered without any special act of congress to carry that treaty into effect.
[Cited in Re Stupp, Case No. 13,562.]

2. They may be examined, and, if believed guilty, be ordered into custody with a view to a future surrender; and this may be done by a magistrate of a state, though he is not compellable to do it by the United States.
[Cited in U. S. v. Ames, Case No. 14,441.]

[1] [Reported by Chas. L. Woodbury, Esq., and George Minot, Esq.]

3. The order to surrender may be signed by the secretary of state, and issue from the state department.

4. Without such proceedings for a surrender as are in that treaty, the law of nations leaves it optional with the executive.

[Cited in Ex parte McCabe, 46 Fed. 371.]

5. The application for the surrender may be made by the British minister, and need not be founded on a previous indictment found against the prisoners by the British tribunals, or on any warrant issuing therefrom.

This was a petition for a habeas corpus on account of what was averred to be an unlawful imprisonment of the petitioners [Thomas Sheazle and others] in Leverett Street Jail, by means of an illegal warrant from James Buchanan, secretary of state, executed by the marshal of the district of Maine. The writ was issued and the prisoners brought into court the same day, being October 16th, 1845, and the keeper of the prison returned, as the cause of the detention, a warrant against the prisoners in the hands of Virgil D. Parris, marshal of Maine, for the purpose of taking and delivering them to the British consul or vice-consul for trial in Great Britain. The said Parris set out in a supplemental return the warrant itself, as having been issued September 25th, 1845, stating among other things, that Sir R. Packenham, the ambassador from Great Britain, had applied to the American government, under the treaty with that nation, of August, 1842, for the surrender of these prisoners for trial for the crime of piracy, being, as was alleged, the subjects of Great Britain, and guilty of said crime on board the British barque Champlain on the high seas. It was further averred in the warrant, that the prisoners, after the commission of the offence, had landed first in the United States at Machias, in the state of Maine; that they had there been arrested and examined for the offence by Albert Pilsbury, a justice of the peace for said state, who, finding probable cause for conviction of them, had sent them to prison, and, on this requisition under the treaty aforesaid, the warrant from the state department required the marshal of Maine to deliver them up to the consul or vice-consul of the British government, who might be authorized to take them home for trial.

Mr. Rantoul, Dist. Atty., for the United States, in behalf of the government.

Mr. Eldridge, for prisoners.

WOODBURY, Circuit Justice. This case is important, as involving the liberty of individuals on the one hand, and the duties of the government in fulfilling solemn stipulations of treaties on the other. In the first place, it is uncontroverted, that the prisoners were a part of the crew of a British vessel,—were British subjects,—were charged with the commission of a crime under British jurisdiction and against British laws. It was a piracy, created by acts of parliament, and not one under the laws of nations. They are not, then, amenable to our tribunals and laws for final trial or punishment, but ought to be examined, and if guilty, punished by the tribunals and laws under whose jurisdiction they lived when the offence was committed, and whose penalties, if any, they have incurred. It was, then, a proper case, and one expressly enumerated under the stipulations in the treaty of 1842 for a surrender of a supposed offender. But without such a stipulation, however fit it might seem in point of comity or morals to surrender citizens of other countries to answer for offences committed at home against their own laws, it is usually considered that there is no political obligation under the laws of nations to do it. Holmes v. Jennison, 14 Pet. [39 U. S.] 540, 549; U. S. v. Davis [Case No. 14,932]. It is optional to do it or not, though in case of mere political offences, it is seldom done. Mure v. Kaye, 4 Taunt. 34; Short v. Deacon, 10 Serg. & R. 125. But see Ex parte Washburn, 4 Johns. Ch. 106; 1 Am. State Papers, 115; New York v. Miln, 11 Pet. [36 U. S.] 102. See U. S. v. Robins [Case No. 16,175].

The next objection is, that the inquiry into the conduct of the prisoners, preliminary to their commitment, was not had by a competent officer. We have no doubt it is proper for us to look behind the warrant, so far as to see that it was issued in a proper case and by a competent officer. Smith's Case [Case No. 12,968]; Milburn's Case, 9 Pet. [34 U. S.] 704. It is conceded, that the inquiry relied on was not had by any officer of the British government. By the analogy to cases of fugitives from justice in one state to another, there would seem to be some ground for this objection. In that class of cases, it is believed to be customary to accompany the demand for a surrender with some evidence of a preliminary examination, and a warrant or indictment, if not a conviction of the offender at home for some breach of the penal code. At least an affidavit of guilt, made there, seems indispensable by the act of congress of February 12th, 1793, c. 7 (1 Stat. 302). Such may have been the practice also, generally, if not always, under Jay's treaty of 1794. Under a treaty with Prussia, it is said that a consul has been authorized to make such a preliminary examination, as in some cases consuls are authorized to try questions of prize by some governments. But the present application is made by virtue of the tenth article of the treaty of August 9th, 1842, with Great Britain, and which expressly provides for an examination of the evidence of criminality by some magistrate in the place or country where the supposed offender is arrested. He may merely be charged with one of the crimes specified in the treaty as having been committed within the jurisdiction of Great Britain, and may seek an asylum, or be found within our territories; and then a

magistrate here is empowered to issue his warrant and arrest the fugitive, and himself examine into the imputed offence before committing him, and, unless satisfied of the guilt, will not detain him.

This evidently was intended 'to reach cases where no such examination had been made elsewhere, and the only remaining question under this head is, whether the examination in the present case was made here by a competent magistrate. It has been contended, that no magistrate is competent for this purpose, unless he be one commissioned under the general government. There is some plausibility in this, and it has been held by Judge Roane and others in Virginia, that any duty devolved by the general government on state courts or officers, who hold commissions under the states alone, need not be performed by them, unless they please. Serg. Const. Law, 275–290; Federalist, No. 81; 1 Va. Cas. 321; 2 Va. Cas. 34; 1 Dana, 442; Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 304, 354. See, also, Houston v. Moore, 5 Wheat. [18 U. S.] 1, 27, 28; 7 Conn. 239; Car. Law Repos. 300; U. S. v. Lathrop, 17 Johns. 4; Conk. Prac. 399. In Wayman v. Southard, 10 Wheat. [23 U. S.] 1, 40, Chief Justice Marshall says, in relation to the "Agency of state officers" for the general government: "The laws of the Union may permit such agency, but it is by no means clear that they can compel it." It certainly would be an anomaly to hold any such officers, against their wishes, to be amenable and acting as officers for the general government, or to exercise compulsory control over them on subjects where the state authorities have imposed no such obligation. Justice Johnson [Martin v. Hunter's Lessee], 1 Wheat. [14 U. S.] 362. Some other cases sustain their doings in civil matters, though not in criminal ones. U. S. v. Dodge, 14 Johns. 95. It has been customary for congress to authorize suits in the state courts for penalties under some of the revenue laws, and to collect debts there by assignees under the bankrupt laws, if not in other cases. Sullivan v. Bridge, 1 Mass. 511; Brown v. Cuming, 2 Caines, 33; Ward v. Jenkins, 10 Metc. [Mass.] 583. And Tucker, in his edition of Blackstone (volume 1, pt. 1, p. 182), says, congress may vest such power in state courts in small offences against the peace and the revenue laws. Constables in New England have venires directed to them from United States courts to summon juries, and do it. It has been so for half a century, and if they should refuse, perhaps we could not enforce it; but if they act, the juror is in contempt, and has often been fined and legally, if so summoned and he did not come. See the form of venire, &c., in U. S. v. Smith [Case No. 16,346]. So we use state jails and state prisons; but there the state laws usually permit it in express terms. But not so as to constables to serve venires; and as to jails, it is permissive often, it is believed, rather than directory. But at the same time, if duties are previously devolved on magistrates by their own state laws,—such, for instance, as the examination into alleged crimes, and if found not to be triable by them, to hand the prisoners over to the United States or other governments having jurisdiction; and if by treaties or laws of the United States, they are requested to perform these same duties, or their acts in performing them are adopted as valid, the subject assumes a new aspect. In Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, 631, Chief Justice Taney and J. Daniels, held, I think discreetly, that states may properly pass laws, if they please, to aid congress in enforcing duties, and, if not conflicting with any by congress, they are valid, and to be encouraged. So if their magistrates, under old powers or new ones, are willing to perform duties and do perform them, without exception taken before magistrates, we think their proceedings can be sustained. Such is this case, and we confine ourselves to this alone. They act virtually in the first instance under their own state laws, which require them to make preliminary inquiries into offences. See cases before cited, and Gord. Dig. 185, note, and [Martin v. Hunter's Lessee], 1 Wheat. [14 U. S.] 336. They act also safely for the prisoners and the government, when a treaty adopts their doings, as they are bound in all cases to respect treaties and the rights under them in the discharge of their duties, no less strongly than officers of the general government; and they do not convict or finally try the guilt, but merely hold the party to answer and be tried elsewhere. Id. 304. They acted here, too, voluntarily, and without objection taken before them. After all this, we do not feel warranted in holding their acts to be void as to these prisoners.

The legislation on this subject by congress, commenced with the earliest operations of the government. By an act passed September 24th, 1789, c. 20, § 33 [1 Stat. 91], the justices of the peace in the different states are empowered to examine and commit offenders in cases arising under the laws and jurisdiction of the United States. The act of July 16th, 1798, c. 13, is similar in character. 1 Stat. 609; Conk. Prac. 399. A treaty has all the binding force of a law, by an express provision of the constitution. Article 6. The treaty of 1842 seems to recognize and adopt the propriety of such an examination under it, "by any judges or other magistrates" having power over similar inquiries, and to certify the fact, if appearing to be guilty. A magistrate commissioned by the general government, would possess no more power in such case than one commissioned by a state, unless the constitution, or a treaty, or an act of congress had conferred upon him authority to carry on such an inquiry, except perhaps that such a magistrate might have power to commit persons charged with offences against the United States, without a special provision. 1 Burr's Trial, 807, 809. We must, then, re-

cur to the acts of congress before mentioned, and the treaty as engrafting or vesting the authority in this case, or the general powers devolved by state laws and usages on justices of the peace, for making the first inquiries into offences that have been committed, and then sending the prisoners where the laws of the state, or the supreme law of the land, to be found in the constitution and treaties, may require. See, in Serg. Const. Law, 281, a case sustained by Judge Cheves, on the ground, that the duty is ministerial rather than judicial, and no trial or prosecution of the offence is carried on before them. So in another case,—Serg. Const. Law, 281. So Com. v. Holloway, 5 Bin. 512, the authority was unquestioned.

The treaty makes express provision that the certificate be made to the proper executive authority, in order that a warrant may issue by him for the surrender of the fugitives. Now, if a treaty stipulated for some act to be done, entirely judicial, and not provided for by a general act of congress, like that before cited, as to examinations such as here before magistrates, it could hardly be done without the aid or preliminary direction of some act of congress prescribing the court to do it, and the form. But where the aid of no such act of congress seems necessary in respect to a ministerial duty, devolved on the executive, by the supreme law of a treaty, the executive need not wait and does not wait for acts of congress to direct such duties to be done and how. There is no appropriation of money required, so as to raise the question, formerly much discussed, as to the power of the house of representatives, in such cases, being either concurrent or merely declaratory. Nor is there any special form, or assignment of authority to be exercised here, which requires detailed provisions by legislation, beyond what is so unusually full in this treaty itself. See on this the debates as to Jay's treaty, and the convention with England of 1818. A case, where an act of congress has been deemed necessary to aid the executive in enforcing treaties, is one passed 2 March, 1829, c. 41 (4 Stat. 359), for imprisoning deserters from foreign vessels, drawn up by myself. And there are several, where appropriations of money are necessary, and some, changing duties on imports, to conform to treaties. It is here only on the ground, that the act to be done is chiefly ministerial, and the details full in the treaty, that no act of congress seems to me necessary. U. S. v. Robins [supra.] See, further, 1 Bl. Comm. Append. (by Tucker) 1–5.

What is "the proper executive authority," under the treaty, is the next question. I think it cannot well be doubted, when we recollect that it is a subject connected with the duties of our foreign relations, and executive or ministerial in its character. Those relations are in charge of the general government, and more immediately of the state department in that government, under the direction of the president. It has very properly been said, in argument, that had the president in person been intended, he would probably have been designated as the president, or the executive. And had not the duty been ministerial, some branch of the judicial department would have been appointed for this duty, or the judiciary generally. In the case of U. S. v. Robins [supra], which at once occurred to me when this petition was first mentioned, the president himself, in the absence of any designation of the officers to surrender under the treaty of 1794, seems to have preferred the request to have the prisoner surrendered, and the court, under that request, delivered him up to the British agents when brought before it by a habeas corpus. That case, when first read, some thirty years since, made a deep impression on my mind, from sympathies for the seaman being rumored to have been impressed, and an American; and from the very able argument by Chief Justice Marshall, then a member in congress, where the case was agitated after the surrender of Robins. But here the facts are entirely different. The averments, that the prisoners were British subjects, voluntarily serving in a British vessel, and offending against British laws, if at all, are not controverted. Had there been no expression in the treaty, looking to some "proper executive authority," the warrant to be issued, which is provided for in this case, and not in the treaty of 1794, might as suitably emanate from the state department as the president. For the president, as such, issues no such precepts in any case; has not the public seal; has no records, nor even executive journals; and his correspondence and action with foreign powers are entirely through the state department; and the acts of the latter on topics connected with them, are generally regarded as his, in point of law. U. S. v. Eliason, 16 Pet. [41 U. S.] 291, 302. They might perhaps in this case be justified as his, if he alone could make the surrender. But the state department, by analogy to England, where it issues many species of warrants, would be most likely to occur to the minds of the negotiators in the treaty of 1842, as the suitable one to issue the warrant therein provided for; and hence, the expression of "proper executive authority," was probably selected to designate it, or coerce its action when convenient, rather than another form of expression, which would confine the power to the president, acting only in his own name and person. One surrender has already been made, it is said, in this district, in this way; and we all recollect another of the Scotch woman, for a supposed murder, made in the district of New York. No objection is urged, that the demand by the British minister does not come from a proper officer. Under these considerations, then, we deem it our duty to order, that the prisoners be remanded to the custody of those from whom they were brought up.