---

## Case No. 8,162.

### In re LEARY.

[10 Ben. 197.] [1]

District Court, S. D. New York. Jan. 1879.

EXTRADITION—HABEAS CORPUS—PRACTICE — CONCLUSIVENESS OF WARRANT—EVIDENCE.

1. On habeas corpus, where the prisoner is held under an extradition warrant of the governor, which recites that it was issued upon the requisition of the governor of another state, accompanied by a copy of an indictment for burglary, certified as duly authenticated, the warrant is conclusive evidence that the person named therein stands charged with crime in such other state within the meaning of the constitution and of U. S. Rev. St. § 578 (Act 1793, c. 7, § 1 [1 Stat. 302]).

[Cited in Ex parte Brown, 28 Fed. 654.]

2. Although by his traverse to the return the prisoner denies that any such charge of crime was made or that there is any such indictment against him, and craves oyer of the same and demands that the respondent be put to the proof thereof, it is not necessary for the respondent to produce a copy of such indictment or of the requisition of the governor of the demanding state, nor is the prisoner entitled to a writ of certiorari or other process against the governor to compel the production of the papers on which the warrant issued, nor is it necessary that copies of said papers should be annexed to the warrant, nor that a copy of the indictment authenticated in the mode provided by act of congress for the authentication of records of one state to be used in another state (Rev. St. § 905), should be produced to the governor before the issue of the warrant.

3. Where the petition for habeas corpus and the traverse to the return denied that the prisoner was a fugitive from justice, or the person named in the warrant, and the respondent produced a witness who testified that he attended the session

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

of the grand jury in the county in which by the warrant it appeared that the crime of burglary was charged to have been committed, and that the subject of inquiry was the said burglary, and that he was sworn as a witness, and that his testimony related to J. L. and others, and the meetings of said persons, and that the J. L. referred to in his testimony was the prisoner, and that he procured the warrant from the governor: *Held*, that this was sufficient evidence, at least prima facie, that the prisoner, whose name was J. L., was the same person named in the warrant and a fugitive from justice, although the witness testified on cross-examination that he never saw the prisoner in such other state.

4. Whether in all cases the warrant is conclusive evidence on habeas corpus that the person named therein is a fugitive from justice, quere.

5. The word "crime," in the article of the constitution relating to inter-state extradition and the statute (Rev. St. § 5278), includes every act made criminal by the law of the demanding state, whether it was so at common law or not, and even though made so by a law subsequent to the adoption of the constitution and the passage of said act of congress.

6. Under U. S. Rev. St. § 760, no pleading is required after the traverse to the return. The new matter averred therein is to be deemed at issue.

7. On habeas corpus the question of the identity of the prisoner with the person named in the warrant is always open.

8. A court of the United States has jurisdiction of a petition for habeas corpus by a person alleged to be illegally restrained of his liberty under or by color of the authority of the United States, although a proceeding by certiorari is pending in a state court at his suit for the review of a decision of an inferior court dismissing the writ of habeas corpus issued on his petition.

9. On habeas corpus before a court of the United States sued out by a prisoner held under a warrant of the governor as a fugitive from justice, it is not necessary that notice of the proceeding be given to the attorney-general of this state.

At law.

Peter Mitchell (A. S. Sullivan, of counsel), for petitioner.

H. W. Bookstaver (W. Britton, of counsel), for sheriff.

CHOATE, District Judge. The petitioner, John Leary, by his petition sworn to the 21st day of December, 1878, applied to this court for a writ of habeas corpus, averring that he was held in custody by the sheriff of the city and county of New York; that the pretence of his imprisonment was a warrant issued by the governor of New York directing the sheriff to arrest said Leary and deliver him over to the custody of one Pinkerton, to be taken to the state of Massachusetts, upon a requisition of the governor of Massachusetts to the governor of New York, charging him with the commission of a felony in the state of Massachusetts and with being a fugitive from justice from said state; that the petitioner denied that he was the person named and mentioned in said requisition or in said warrant of extradition or that he ever fled from the said state of Massachusetts to the state of New York.

The writ was allowed, and the sheriff produced the prisoner and made return that he arrested and held him under a writ or requisition directed and duly issued to him as such sheriff by the governor of New York, of which writ he annexed to his return a copy and the original of which he produced, and secondly, that, while he so held the petitioner in custody, a writ of habeas corpus was served upon him issuing out of the supreme court of the state of New York, requiring him to produce the petitioner before one of the justices of that court; that in compliance with the writ he had produced the petitioner before said justice, that a hearing was had on said writ of habeas corpus and finally determined by an order dismissing the writ and remanding the prisoner; that afterwards the prisoner sued out a writ of certiorari to review said determination, upon which writ a justice of said supreme court had made an endorsement allowing the same and directing that said writ operate as a stay of proceedings until the decision of the general term of said court thereon, and directing that the sheriff in the meanwhile keep the prisoner in his custody. The relator filed his answer or traverse, wherein he denied that he was the person mentioned or described in the alleged requisition, if any was made by the governor of Massachusetts, or that he was the person mentioned in the warrant of arrest, or that a copy, certified as authentic by the governor of Massachusetts, of any indictment found or affidavit made before any magistrate of said state of Massachusetts, charging him with having committed any crime in Massachusetts, was produced by the executive authority of Massachusetts to the governor of New York in connection with any such alleged demand, or that any charge of any crime under the provisions of the constitution of the United States, or of the acts of congress in such behalf, had ever been made in the state of Massachusetts against him, on which the arrest and detention were founded, or that any such pretended charge in the form of an indictment or affidavit had been produced before, furnished or exhibited to him the relator as the basis of said proceedings for extradition. And he craved oyer of said pretended charge, if any, and that the respondent should be put to his proper and necessary proof. He also denied that, at the date of the alleged demand by the governor of Massachusetts, the governor of that state had before him any facts showing that the petitioner then was, or ever had been, a fugitive from the justice of that state, and he denied that he was such fugitive, or that any facts or evidence were shown or produced to the governor of New York, sufficient to show that he was such fugitive from justice. He also denied the commission of any offence in the state of Massachusetts, or that he was ever in the county of Hampshire where said crime was alleged to have been committed. He further alleged that he was a

citizen of the state of New York and had been a resident thereof for the last five years; that he was not in the state of Massachusetts at the date when said alleged crime was committed nor for five years prior thereto nor at any time since; that the said requisition was procured and his arrest and extradition promoted for some hidden and ulterior motives, and that the whole proceeding was a misuse and abuse of the provisions of the constitution and laws of the United States in which the governors of Massachusetts and New York had been unwittingly misled.

The writ or mandate issued by the governor of New York, recited that "whereas, it has been represented to me by the governor of the state of Massachusetts that John Leary, James Brady, James Draper and James Grier, stand charged with the crime of burglary and entering the Northampton National Bank and stealing the moneys thereof, committed in the county of Hampshire in said state, and that they have fled from justice in that state, and have taken refuge in the state of New York; and the said governor of Massachusetts having in pursuance of the constitution and laws of the United States, demanded of me that I shall cause the said John Leary, James Brady, James Draper and James Grier to be arrested and delivered to Robert A. Pinkerton, who is duly authorized to receive them into his custody and convey them back to the said state of Massachusetts; and whereas, the said representation and demand is accompanied by a copy of this indictment, whereby the said John Leary, James Brady, James Draper and James Grier are charged with the said crime, and with having fled from said state and taken refuge in the state of New York, which is certified by the said governor of Massachusetts to be duly authenticated, you are therefore required to arrest and secure, etc., etc."

Upon the return day of the writ, besides the sheriff, who appeared in person and by counsel, the state of Massachusetts appeared by counsel.

The petitioner having filed his traverse or answer to the return, it was held that the statute required no further pleading, but that the averments of the answer would be taken as denied by the respondent.

The return having been filed, the counsel for the state of Massachusetts moved that the writ be dismissed or that the prisoner be remanded pending the proceedings in the state court on the writ of certiorari, on the ground that the prisoner was to be regarded as constructively in the custody of the state court and that therefore this court would not, on principles of comity, proceed with a matter which might involve the taking of the prisoner out of the custody of the state court. But it was held that the proceeding pending in the state court, in the nature of a review on appeal from the decision of the justice, did not prevent this court from proceeding with the cause, and the motion was denied.

The counsel for Massachusetts then and before the traverse was filed, by leave of the court withdrew his appearance.

The counsel for the prisoner moved that notice be given of these proceedings to the attorney-general of the state of New York. But it was held that the statute required no such notice and the motion was denied.

The respondent then called as a witness one Robert A. Pinkerton, who testified that his occupation was that of a detective, that he had known the prisoner for four or five years in several cities; that he was present at proceedings before the grand jury of Hampshire county in Massachusetts in June, 1877, and was sworn as a witness; that the subject of inquiry was the robbery of the Northampton Bank, that his testimony related to John Leary, James Brady, James Draper and James Grier, and in relation to meetings between those four persons; that the John Leary, to whom his testimony related, was the prisoner; that he caused this mandate of the governor of New York to be procured and that it was sent to him by the governor. On cross-examination he testified that he never saw the prisoner in Massachusetts.

The mandate of the governor was then read in evidence.

Upon this evidence, the respondent having rested, the counsel for the prisoner moved for his discharge, on the ground that there was not sufficient evidence that he was the person against whom the mandate issued, nor that he was a fugitive from justice, nor any competent evidence that he was charged with crime. This motion was denied and it was held that there was sufficient evidence for the respondent on these issues, at least prima facie.

The counsel for the prisoner offered to read in evidence as an affidavit the petition for the writ of habeas corpus. The prisoner was in court. The motion was denied on the ground that it would not be a proper exercise of the discretion, with which the court is vested to receive affidavits in evidence on proceedings of this character, to receive this affidavit, the affiant being present and able to testify in person.

The counsel for the prisoner claimed that the burden of proof as to a charge of crime was upon the respondent; that the petitioner having denied that he was charged with crime, the respondent should be held obliged to produce a copy of the indictment, if any there was, duly authenticated according to the provisions of the act of congress regulating the authentication of the judicial records of one state that are offered in evidence in another state, that is, a copy certified by the clerk of the court under its seal with the certificate of the judge to the genuineness of the clerk's attestation; that the re-

spondent was also bound to produce proof that a requisition had been made by the governor of Massachusets in the form and with the accompanying documents required by the constitution and act of congress, and that these papers on which the governor of New York issued his mandate, or authenticated copies of them, should be produced before the court, so that the court might pass judicially on the question whether those papers contained a charge of crime and justified the issue of the warrant. And the counsel for the prisoner claimed further, that even if the recitals of the mandate are prima facie evidence of the existence and sufficiency of these papers, that the prisoner has a right to produce them, and in case they, or copies of them, are not on ·his request furnished by the governor, that he should have the process of the court to compel their production.

The prisoner has shown that he has applied to the governor of New York for these papers or copies of them, and that the governor has declined to furnish them. He has also used due diligence to obtain copies of them from the governor of Massachusetts, but he has declined to furnish them. And the counsel for the prisoner has applied to the court for its aid by some compulsory process to obtain this evidence. And upon the case, as it stands, if these papers would, when produced, be competent evidence in his behalf, and if the court has the power to compel their production, a case has been made out for a postponement of the cause for the issue and return of process for this purpose.

On the other hand, it is contended by the respondent that the mandate of the governor is not only prima facie but conclusive evidence in these proceedings of the fact that the prisoner is "charged with crime" within the meaning of the constitution and the act of congress; that the papers on which the governor acted would not be, if produced, competent evidence, and that there is no power in the court to compel their production.

This question depends upon the construction of the clause of the constitution relating to fugitives from justice and of the act of congress which was passed to carry it into effect. The clause of the constitution is as follows: "A person charged in any state with treason, felony or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." And the act of congress passed in 1793 to carry this constitutional provision into effect and to provide a mode of procedure under it (1 Stat. 302) is as follows: "Section 1. That whenever the executive authority of any state in the Union, etc., shall demand any person as a fugitive from justice, of the ex-

ecutive authority of any such. state, etc., to which such person shall have fled, and shall moreover produce the copy of an indictment found or an affidavit made before a magistrate of any state, etc., as aforesaid, charging the person so demanded with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the state, etc., from whence the prisoner so charged fled, it shall be the duty of the executive authority of the state, etc., to which such person shall have fled, to cause him or her to be arrested and secured, and notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear." Section 2 authorizes such agent to transport the person so delivered to him to the state from which he shall have fled.

For the proper understanding of these provisions, it is necessary to consider the nature of the subject matter thus regulated and the existing state of affairs at the time of the adoption of the constitution and the passage of this statute. The duty of delivering up fugitives from justice as between independent states and nations, unless affected by treaty, that is, by express contract between them, rests wholly on principles of comity, that is, upon the natural inclination of states on terms of amity with each other, to concede to each other such reasonable favors on request as shall not be inconsistent with their own interests or the rights and interests of their own subjects or citizens, and to secure for themselves a reciprocity of benefits by the exchange of such friendly offices. And while some continental jurists have claimed that the surrender of fugitives from justice in cases of atrocious crime may be demanded as a right by one state of another, this right has in England and this country been denied to have any existence. Story, Confl. Laws, § 628, and authorities cited; Opinions of Jefferson, Monroe and Clay, cited in Hurd, Hab. Corp. (2d Ed.) pp. 578, 579. And see Holmes v. Jennison, 14 Pet. [39 U. S.] 540.

It·has been said that "prior to the American Revolution, a criminal flying from one English colony into another, found no protection, but was arrested by the authorities of the territories into which he fled and delivered up for trial within the jurisdiction where the offence was committed, and this because the several colonies formed but parts of the same empire, under a common sovereign, and therefore presented no opportunities for the conflict of the rights and duties of independent sovereigns." Letter of Judge Bell to the governor of Penn., 2 Pa. Law J. p. 150.

It appears, however, that the practice of returning such fugitives as between the American colonies, rested partly at least on treaties

between the several colonies. Treaty between the colonies of Mass., New Plymouth and Conn., referred to by Chief Justice Taney in Kentucky v. Dennison, 24 How. [65 U. S.] 101. But whatever may have been the practice in this respect between the colonies, and on whatever basis of law or treaty it rested, there is no doubt that when the colonies achieved their independence they stood towards each other, as regards this matter, in the position of independent states, and the surrender of fugitives from justice became, as with other sovereign states, purely a matter of comity, except so far as it was or should be regulated by treaty or compact between them. And yet from the manner in which the country had been settled, and from the artificial character of the state boundaries, the dividing lines between them having been fixed with little or no regard to natural barriers or lines of defence, running in some cases in the close vicinity of cities or large towns, being, in fact, such boundaries as could only have been produced or continued during a long period of peace between the colonies, the escape of fugitives from one of the states to another was peculiarly easy, and the mischiefs thus resulting threatened not only the domestic peace of the states, but also their friendly relations with each other, unless some reasonable regulation thereof was effected. And when the articles of confederation were adopted, a provision was made for the surrender of fugitives from justice almost identical with that afterwards incorporated into the constitution of the United States. The language of the constitution is, as regards the nature of the duty to deliver the fugitive, imperative and unequivocal. "A person charged with treason, felony, or other crime, who shall flee from justice and be found in another state, shall, on demand, etc, be delivered up." And the great weight of authority, as well as the obvious import of the language used, is that the constitution established an absolute right to the surrender, when the case was one coming within the terms of the constitution—that is, the case of a person charged with crime—who had fled from justice—and whose surrender was demanded by the proper authority. It is true that the duty has been by the governors of some of the states treated as discretionary, but the authorities are clearly against this view. Kentucky v. Dennison, 24 How. [65 U. S.] 66. It has been well remarked in reference to the case last cited. that although the court finally came to the conclusion that they had no jurisdiction to grant the mandamus prayed for, yet the views expressed in that decision as to the construction of this clause of the constitution possess but little less than the force of absolute authority. In re Voorhees, 32 N. J. Law, 149. And it is now settled by a great preponderance of authority, state as well as federal, that the word crime in this clause of the constitution embraces every species of offence made punishable as a crime by the laws of the state making the demand, even though it were not a crime by the common law or the laws of other states, and even though for the first time made a crime by a law passed subsequently to the adoption of the constitution and the passage of this act of congress.

Therefore, it appears that the right to demand the surrender of a fugitive from justice, as between these states, is no longer an imperfect right to be conceded as matter of favor or comity, or refused, if the state in which he has taken refuge may so determine, on consideration of its interest or policy, or its view of international law, nor a right resting in the obligation of a contract alone, as by treaty, but a constitutional and legal right, having fixed and well-ascertained conditions. And the same instrument or frame of government, which for national purposes welded the several states into a single country, brought this matter and this obligation within the purview and jurisdiction of the federal authority. As the constitution is more than a compact between the states, so this right and this obligation, as secured by the constitution, became something more than an obligation and a right resting in contract or treaty.

But the constitution did not provide means for carrying into effect this provision, and soon a case arose between Virginia and Pennsylvania, in which the return of a fugitive was denied, because congress had passed no law pointing out the means for enforcing this provision,—determining how and on what officer the demand should be made, and by what evidence it should be supported. Then followed the act of 1793, now in question. By that act the demand is required to be made on the governor of the state, and to be accompanied by a copy of the indictment found, or affidavit before the magistrate, charging the crime, certified by the governor of the state making the demand as authentic.

* Independently of all constitutional and legislative provisions, the surrender of fugitives from justice has, between nations, been treated as an executive power lodged in the supreme executive authority of the state. It was an international concern, and the executive is the organ of communication between one state and another, and under the first treaty with Great Britain, in the case of Robbins, the power of the president to surrender a fugitive from justice, whose extradition was claimed under a treaty which is declared by the constitution to have the force of law, was held by the concurring authority of the executive department of the government, the house of representatives and the district court of the United States for the district of South Carolina to be exclusively an executive power and duty in the absence of any legislative regulation. See statement of this case in Hurd, Hab. Corp. (2d Ed.) pp. 582–588. See, also, Holmes v. Jennison, supra. Although this case provoked great

discussion, yet the result shows how strongly, at that time, the opinion prevailed that this was essentially an executive power. While congress had a considerable latitude of choice as to the means to be employed to enforce this constitutional obligation and right, it saw fit to preserve, as nearly as possible, the existing methods as to dealing with the subject, devolving the duty of performing the obligation on the supreme executive authority of the state where the fugitive might be found. As to the evidence to be produced to him that the party demanded is charged with crime, the mode of proof is particularly prescribed and limited by the act itself. It must be by a copy of an indictment or affidavit certified by the governor of the state making the demand as authentic. Under this statute clearly no other evidence is sufficient, or can be received by the governor on whom the demand is made as sufficient in proof of the fact that such indictment or affidavit exists as the basis of the charge of crime. The constitution provides that "full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state, and congress may, by general laws, prescribe the manner in which acts, records and proceedings shall be proved, and the effect thereof." Congress has, by general laws, provided the mode of proving in one state the judicial records of another state, but it was clearly competent for congress, by a general law, to provide what should be the mode of proving an indictment, or other judicial proceeding, for the purpose of these extradition proceedings, and congress having legislated thereon, the authentication by the governor of the copy is clearly the mode provided by general law for this purpose, and such authentication imports absolute verity, and no other authentication is necessary to enable the governor to act under the statute, although for other purposes congress has provided a different mode of proving state records. This disposes of the claim that a copy of the indictment certified by the clerk of the court with the accompanying certificate of the judge, must be produced either to the governor or to this court in proof of the fact that the party is charged with crime.

And upon the question whether the warrant of the governor is conclusive evidence in this proceeding that the party named in the warrant stands charged with crime in the state demanding his surrender, I am of opinion that both on reason and authority the warrant is conclusive. The statute itself especially provides, that the governor shall cause the party to be arrested and delivered up. It makes no provision for any other proceedings whatever subsequent to the issue of the mandate of the governor except the delivery of the party and his removal by the agent of the demanding state. It may well be assumed that in devolving this duty and responsibility on the highest executive officer of the state, congress understood that they were making a suitable provision for securing the careful execution of the duty under circumstances calling for great caution and circumspection. The governors of these states were the representatives of the sovereignty of the states, so far as it still existed in a qualified form. They were aided in their positions by high legal officials, and in some of the states had the constitutional right to call on the highest court in the state for its opinion on doubtful questions of law. They were especially charged with the execution of the laws of the state and might be assumed to be naturally jealous of any attempt to abuse this particular right of demanding fugitives, since it was a demand for the surrender of their own citizens or persons found within the protection of their own laws. Not only is there nothing in the act to show that any proceedings subsequent to the issue of the warrant were contemplated to give full authority for the arrest and removal of the party, but there is nothing in the act requiring the governor issuing the warrant to attach thereto the evidence or copies of the evidence on which he acted, nor since the passage of the act has the practice obtained, so far as appears, of attaching such copies. This uniform practice of eighty-five years is strong proof that no such copies are necessary to accompany the warrant. Moreover, neither by this act, nor by any other, is any process given for compelling the governor of a state to perform a federal duty or obligation devolved upon him by a federal law. In this very matter the supreme court of the United States have held that while the duty of surrender is absolute and a mere ministerial duty, yet that, especially in view of the nature and dignity of the office of governor and the great public mischiefs that would result from the exercise of such coercive powers against him, the federal government has not in any of its departments the power to issue the writ of mandamus against him to compel the issue of the warrant. Kentucky v. Dennison, ut supra. It is suggested in the present case that this court can issue a writ of certiorari against the governor, to compel the production of this record, but the objections stated in the case last cited against a mandamus apply with equal or still greater force to the exercise of such a power by this court. Nor can the governor of the state be regarded as in the position of an inferior tribunal or magistrate to whom the writ of certiorari will issue in aid of a writ of habeas corpus. In the performance of this duty, he does not act as an inferior magistrate, but as the representative of, and the officer vested with, the executive authority of the state, and not as a federal officer or magistrate. Speaking of the governor's duty to issue the warrant, Chief Justice Taney says: "The act does not provide any means to compel

the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the executive of the state; nor is there any clause or provision in the constitution, which arms the government of the United States with this power. Indeed, such a power would place every state under the control and dominion of the general government, even in the administration of its internal concerns and reserved rights. And we think it clear that the federal government, under the constitution, has no power to impose on a state officer as such any duty whatever and compel him to perform it; for if it possessed this power it might over-load the officer with duties, which would fill up all his time and disable him from performing his obligations to the state, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the state." "But if the governor of Ohio refuses to discharge this duty (i. e., "the obligation on the state to carry into execution" this law) there is no power delegated to the general government, either through the judicial department or any other department to use any coercive means to compel him." And if it was not within the contemplation of congress that any coercive measures should be used against the governor to compel the performance of the principal duty involved, namely, the issuing of the warrant, it is not supposable that it was within their contemplation that any coercive measures would or could be used to compel the performance of any other duty that might devolve upon him as an incident to, or result of, the performance of such principal duty. And if the issue of a mandamus by the supreme court against a governor might lead to imposing on him duties inconsistent with the performance of the duties of his office of governor of the state and with the dignity of his position, yet more unseemly and improper would be the attempt of an inferior court of the United States to subject him to the process of certiorari to compel the production of papers, with the consequences which must flow from his refusal, of his being treated by the court as in contempt. The total want of power to compel the production of the papers on which the governor acted, is itself a strong argument against the intention of congress to make the governor's determination subject to review by the courts.

The relations in which the states stood to each other at the time of the formation of the constitution, and the relations which that constitution created between them, as known and understood at the time of the passage of the act, make it not improbable nor unreasonable to suppose, that the warrant of the governor should on this question of the fact and sufficiency of the charge be made conclusive within the intention of congress, even though the effect of it is that the party should, when arrested on the warrant, be deprived of an opportunity to contest that fact on habeas corpus in the state in which he is arrested. The prior relations of the states were friendly. They had recently won their independence by a war in which they had acted together. Their territories were largely settled by people from the same country and in all of them the system of the common law of England obtained, by which all persons restrained of their liberty had free access to the courts on habeas corpus, to inquire into the cause of their detention. And the people of these states had entered by this constitution into "a more perfect union," among the declared objects of which were "to establish justice, insure domestic tranquility and promote the general welfare." The thirteen states thereby became one nation, in all parts of whose territory the citizens of each were to have the rights and immunities of citizens of that common country and were not to be in any of the states in the position of strangers and foreigners. Considering that all the disadvantage that results from the conclusiveness of the warrant of the governor on this point is that the alleged fugitive is thereby removed to another state of the Union where he has open to him still the privileges of habeas corpus, and a trial according to the methods and under the securities of a system of law similar to that prevailing in his own state, and where all his privileges of citizenship remain, and considering the existing relations of the states, there was neither such hardship nor such apparent risk of injustice as to have created any reasonable apprehension that such an arrangement imperilled or put in jeopardy the life or liberty of the citizen, or was liable to subject him to any unreasonable detention or inconvenience beyond what was essential to a proper regard to the public safety and the orderly administration of public justice. The unhappy differences that have since arisen between the several parts of the Union, and which might have suggested danger to life or liberty in this arrangement, did not then exist and cannot have been had in view by the congress which framed this law.

In the treatment of this subject it is not to be overlooked that this is in the nature of a national police regulation, and that the arrest, detention and removal of the alleged offender are not for the purpose of punishment, but for purposes preliminary to trial, and for the securing of persons against whom there is probable cause to believe that they are offenders against the laws, and that this provision of the constitution and this act of congress are based upon the theory that as between these states the proper place for the inquiry into the question of guilt or innocence is the state where the offence is alleged to have been committed.

In view, then, of the nature of the right and obligation sought to be enforced by this

statute, of the prior history of the subject matter, of the terms of the law itself and the practice under it, of the character and dignity of the office of the governor on whom the duty of determining the question prior to the issue of the warrant devolved, of the security against abuse afforded by his position, responsibility and surroundings, of the evident impossibility of issuing process to review his decision, and of the relation between the states before and at the time of the enactment of the law, and of the purpose and effect of the warrant of removal, I think that the recital of the warrant was intended by congress to be conclusive as to the charge of crime made against the alleged fugitive and that the refusal of Governor Robinson to furnish to the petitioner the requisition and accompanying copy of indictment for the purpose of the proposed review of this decision by this court was in entire accordance with the proper view of his official duty, under the act of congress in question.

As a question of authority, the decisions of the courts are conflicting. In State v. Buzine, 4 Har. (Del.) 572, Chief Justice Booth held the warrant conclusive, disposing of the matter in the following language: "These matters are entrusted to the judgment of the executive upon whom the demand is made; and if his mind is fully satisfied in regard to them, the act of congress makes it his imperative duty to cause the fugitive to be arrested and delivered up to the regularly constituted agent of the state from which he fled. The warrant of the executive under the great seal of the state, reciting the facts necessary, under the act of congress, to give him jurisdiction of the case, would, in my opinion, at the hearing of the habeas corpus, be conclusive evidence of the existence of those facts, of his judgment in relation to them, and of a compliance with the constitution of the United States and the act of congress. No investigation, therefore, in such a case, can be made beyond the warrant of the executive, and no examination into the facts and circumstances of the alleged offense with which the party stands charged." "In the present case, the return sets forth copies of all the documents transmitted by the governor of Pennsylvania to the executive of this state, and the appointment of Schremer as the agent of the state of Pennsylvania to receive the petitioner as a fugitive from justice and to carry him to that state. It appears that all the requisites of the act of congress have been complied with. No suggestions or exceptions have been made to the return. It is therefore admitted to be true. And although my belief is, that the alleged offence with which the petitioner is charged is the same which, upon examination of witnesses at the hearing of the former habeas corpus, clearly appeared to be a breach of trust and not a larceny, he must be remanded because the

return in this case is conclusive. When taken to Pennsylvania, he can obtain relief, if the circumstances of his case entitle him to it, by suing out the writ of habeas corpus."

The same view of the nature of the obligation and the imperative duty to make the surrender is declared in the following cases, in which, however, the exact point now in question was not directly involved, but from the views therein expressed the conclusiveness of the governor's determination is properly to be inferred. Kentucky v. Dennison, 24 How. [65 U. S.] 66; Johnston v. Riley, 13 Ga. 98; In re Voorhees, 32 N. J. Law, 141. In the case of the People v. Brady, 56 N. Y. 182, the majority of the court of appeals of New York do indeed express the opinion that on habeas corpus against the sheriff holding an alleged fugitive under the governor's warrant, it is competent for the court to go behind the warrant, and inquire into the fact and sufficiency of the charge of crime upon the evidence presented to the governor, that is to say, the requisition of the governor of the demanding state, and accompanying papers, and in that case they discharged the prisoner on the ground that such papers did not show that the facts alleged in the affidavit accompanying the requisition constituted a crime by the law of Michigan, the demanding state; but it weakens the force of this authority, that the point of the conclusiveness of the recitals in the warrant was not urged upon the court on the argument, and that the case was submitted by counsel as turning upon the question whether the affidavit did charge a crime by the law of Michigan. See argument of the district attorney, p. 185. The court says (page 186): "It was not claimed by the counsel for the people, that if the papers were defective and insufficient, it was not competent for the court to take cognizance of the question and discharge the prisoner." It is noticeable also that by the pleadings, the papers on which the governor acted were voluntarily brought before the court, and by the demurrer to the traverse their insufficiency appears to have been admitted. The court also alludes to the fact that there was no indictment against the prisoner, but an affidavit only (page 188). Now in some of the cases a distinction has been taken between a case based upon affidavit and one based upon indictment; that in the latter case the authentication of the demanding governor is evidence that the facts charged constitute a crime in the demanding state, and in the former case it is not. This distinction seems to be based on the circumstance that an indictment is everywhere recognized as the proper mode of proceeding for a crime, and therefore that the fact that the charge has been made in that form is to be taken in itself as showing that the facts constitute a crime, that is, an indictable offence. How far this dis-

tinction may have influenced the court of appeals in reaching the conclusion they came to in that particular case, and whether they would hold the same rule in case it appeared that an indictment against the party duly authenticated accompanied the requisition, cannot with certainty be gathered from their opinion. Judge Grover dissented from the conclusions of the court. The court says: "Courts have exercised the right to interfere and to examine the grounds upon which the executive warrant in such cases has issued, and the jurisdiction is justified both by reason and authority." They, however, do not give the reasoning by which they claim to justify it, and they refer for the authority relied on only to the cases of Ex parte Smith [Case No. 12,968], and Ex parte Clark, 9 Wend. 219. The case of Ex parte Clark does not, in my judgment, support the position taken by the learned court. It is true that in that case the court examined and found sufficient the facts alleged in the affidavits accompanying the requisition, as charging a crime under the laws of Rhode Island; the court did not discuss nor decide the point now in question, and so far as its opinion on that point can be inferred from the language of Chief Justice Savage, it would seem to be adverse to the position taken by the learned counsel for the petitioner. The papers were voluntarily laid before the court and it is to be observed that the charge was by affidavit and not by indictment. And it certainly is not so well settled by authority that the authentication by the governor of an affidavit charging the party is under the statute to be taken as conclusive proof that the facts charged in the affidavit constitute a crime in the demanding state, where those facts do not constitute a crime at common law, as it is in the case of an indictment so authenticated. That question, however, does not arise in this case, since the offence charged here is by indictment for burglary, an acknowledged felony at common law. The case of Ex parte Smith [supra], undoubtedly gives some support of authority to the position, that this court may go behind the warrant and inquire whether the prisoner is a fugitive from justice. There was, however, this peculiarity about the offence charged: It was a charge against Smith, the Mormon prophet, for being accessory before the fact, to a murder committed in Missouri, and it was not alleged in the affidavit that he was in Missouri at the time of the commission of the offence; nor was his presence at the time and place of the alleged offence necessarily to be inferred from the nature of the charge. If the charge itself was true. Whether the question of the party demanded having in fact fled from the justice of the demanding state is under the act of congress submitted to the conclusive determination of the governor on whom the demand is made, or whether he can receive any evidence on that point

outside of the papers submitted to him by the governor of the demanding state, are questions, however, that do not arise in the present case, since the offence charged is one which necessarily implies the actual presence of the party indicted within the jurisdiction of the demanding state at the time of the alleged offence, and the better opinion seems to be that where such a charge by indictment is duly authenticated by the demanding governor and the party indicted is in fact found in another state, this is certainly sufficient prima facie evidence of his having fled from justice within the meaning and for the purposes of this statute, perhaps conclusive on the court upon habeas corpus if not on the governor. And in this case the prisoner has not overcome this prima facie case. So far as the cases of People v. Brady and Ex parte Smith are opposed to the views above expressed, I think they are not sustained by reason or by the weight of authority. People v. Brady, though followed by the general term of the First department, was in conflict with the view of the judges of the supreme court in that department, and its correctness on this point is still questioned by them. People v. Reilley, 11 Hun, 94. The case of Senator Patterson before Judge Humphreys of the supreme court of the District of Columbia, also referred to, seems to have turned on the question whether a person sent by a state to congress as its senator can be held to have fled from that state within the meaning of the act of congress. How that fact was brought before the court does not appear in the copy of the opinion furnished me. Other cases were cited upon the argument which it is unnecessary to discuss in detail. In re Heyward, 1 Sandf. 702; In re Soloman, 1 Abb. Pr. (N. S.) 347; In re Washburn, 4 Johns. Ch. 106; In re Leland, 7 Abb. Pr. (N. S.) 64; State v. Howell, R. M. Charlt. (Ga.) 120; Kingsbury's Case, 106 Mass. 223; Brown's Case, 112 Mass. 409; Dow's Case, 18 Pa. St. 37; Com. v. Deacon, 10 Serg. & R. 125; Vallad v. Sheriff, 2 Mo. 26; In re Greenough, 31 Vt. 279. See also a discussion of this statute 6 Pa. Law, J. 417. It is not intended in this opinion to pass on the question whether the requisition itself is sufficient evidence to the governor of the state on which the demand is made that the party charged has fled from justice, where the indictment or affidavit does not expressly or by necessary implication charge that the party accused was within the jurisdiction of the demanding state at the time of the commission of the alleged offence. There is a class of cases of which Ex parte Smith was one, apparently wholly outside the purview of the constitution and act of congress, inasmuch as the party cannot be said to have fled from the state making the demand. These cases are those in which a state has assumed jurisdiction to make an offence indictable, although the party charged was not then, and perhaps never was, within the

state, as, for instance, for murder where the fatal blow was struck outside the state but the injured party died within the state. Perhaps the only and the proper remedy of a party arrested under such a warrant in such a case is to apply to the governor for a revocation of the warrant. All that is necessary to hold in this case as to this point of the party having fled from justice, is that where it appears by the recitals in the warrant that the governor had before him a duly authenticated copy of an indictment against the party for an offence, the commission of which necessarily implies the presence of the party at the time and place of the alleged offence, and, as was the case here, no evidence is offered tending to show that the party is not a fugitive from justice, he is properly held under the warrant. It is not intended to be intimated that evidence that the party never was within the jurisdiction of the demanding state, would, if offered, be admissible on habeas corpus after the arrest on the warrant. One obvious objection that might be urged to the admission of such evidence is, that it would be apparently trying the question of an alibi, one of the possible defences of the party on his trial for the crime alleged, which, as involved in the question of his guilt or innocence, it may have been the design of the constitution and the act of congress to remit for trial exclusively to the state in which the party stands charged with having committed the offence. And another objection might be urged, that congress has apparently submitted the question whether the party charged has fled from justice to the determination of the governor alone.

The question of the identity of the party arrested with the party described as the alleged fugitive in the mandate of the governor is, of course, always open to inquiry on habeas corpus, since that is simply the question whether the mandate has been executed against the party named therein; but on this question the fact has been determined against the petitioner on the evidence. The writ must be dismissed and the prisoner remanded.

———

LEARY (CASEY v.). See Case No. 2,497.
LEARY (DODGE v.). See Case No. 3,952b.